UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| WILLIAM BLAKLEY on behalf of himself and those similarly situated, HELEN BLAKLEY on behalf of herself and those similarly situated, and KIMBERLY SMITH on behalf of herself and those similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> CELADON GROUP, INC., CELADON TRUCKING SERVICES, INC., QUALITY COMPANIES, LLC, QUALITY EQUIPMENT LEASING, LLC, and JOHN DOES 1-10, <br><br> Defendants. | No. 1:16-cv-00351-LJM-TAB |

## ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

This matter comes before the Court on Defendants', Celadon Group, Inc., Celadon Trucking Services, Inc., Quality Companies, Inc., and Quality Equipment Leasing, Inc. (collectively, "Celadon"), Motion for Partial Summary Judgment (the "Motion").[1] Dkt. No. 59. In the Motion, Celadon seeks to dismiss Counts IV, V, and VI of Plaintiffs', William Blakely ("William"), Helen Blakely ("Helen"), and Kimberly Smith ("Smith"), on behalf of themselves and all others similarly situated (collectively, "Plaintiffs"), Second Amended

---

[1] The Motion was originally filed as a Motion to Dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 59. On March 27, 2017, the Court converted the Motion to a Motion for Partial Summary Judgment, pursuant to Federal Rule of Civil Procedure 56. Dkt. No. 81.

1

Individual, Collective, and Class Action Civil Complaint (the "Second Amended Complaint"), with prejudice. Dkt. No. 59; *see also*, Dkt. No. 52. For the foregoing reasons, the Court **GRANTS in part and DENIES in part** the Motion.

## I. <u>BACKGROUND</u>

William and Smith, as well as many other commercial truck drivers (the "Contracting Drivers"), each entered into a written Contractor Operating Agreement (the "Agreement"),[2] Dkt. No. 88, Ex. B-3 at 11-28; Dkt. No. 88, Ex. B-4 at 14-31, through which Celadon sought to utilize vehicular equipment owned or leased by the Contracting Drivers to provide services in connection with its business. Agreement, § 1.03. The Agreement obligated Celadon to pay a Contracting Driver for his delivery services "within fifteen (15) days after submission by [the Contracting Driver] to [Celadon] of [certain] accurately prepared and fully completed documents with respect to such services." *Id.* at § 5.03. The Contracting Drivers agreed "that [their] compensation for services…may be withheld by [Celadon] for payment of, and [Celadon] may set off against [their] compensation for" various charges and expenses that may be incurred during the duration of the Agreement, including "[a]dvances and other extensions of credit by [Celadon] to [the drivers]." *Id.* at § 5.05. The Agreement also stated that the Contracting Drivers were responsible for "[p]aying all operating costs and expenses incidental to the operation of [their vehicular equipment] including but not limited to" costs related to fuel, insurance, oil, tires, repairs,

---

[2] Although Helen performed work for Celadon as a commercial truck driver, she did not enter into the same Agreement as William and Smith and did not personally receive settlement statements from Celadon. Dkt. No. 79, Ex. 11 at 37:6-17, 38:4-11. Because Helen did not enter into the Agreement with Celadon, which serves as the basis for Plaintiffs' allegations in Count III of the Second Amended Complaint for violations of the Truth in Leasing Act, Count III of the Second Amended Complaint as it related to Helen's claims must be **DISMISSED**.

2

licenses, plates, and tolls. *Id.* at § 9.02(c). Furthermore, the Agreement required each Contracting Driver to maintain an escrow account and authorize Celadon, in its discretion, "to apply all or any portion of [a driver's] Escrow Account to the payment of any charges or indebtedness" incurred during the term of the Agreement. *Id.* at §10.04. If a Contracting Driver was indebted to Celadon in an amount greater than that held in his escrow account, his indebtedness would be reduced by the amount available in his escrow account, and that Contracting Driver would be personally liable to Celadon for any remaining indebtedness. *Id.* at § 10.05. If any amounts remained in a Contracting Driver's escrow account after his Agreement was terminated, the remaining amounts would be returned to that driver. *Id.* at §§ 10.05, 10.06.

While working with Celadon, Plaintiffs regularly requested and received advances from Celadon for personal use and for costs associated with operating their vehicles, in exchange for one-time service fees ranging from $3.50 to $7.50 for each advance.[3] Dkt. No. 79, Ex. 26 ("Isaacs Dep."), 26:1-28:4, 33:22-40:16; Dkt. No. 88, Ex. A ("Isaacs Decl."), ¶¶ 7, 11. Celadon typically provides such requested advances to its drivers, including the Plaintiffs, by either loading the funds onto the drivers' fuel cards or by issuing an "express code" that would allow the drivers to obtain cash at truck stations. Isaacs Decl. ¶ 10; Isaacs Dep., 37:10-38:9. These advances, and their associated service fees, are generally "tied to the trip that [a driver is] on when he takes the advance" and are reflected as reductions on the driver's paycheck for that trip. Isaacs Dep., 65:7-66:14. *See also*, Isaacs Decl., ¶ 9. When the total amount due to a driver for a particular paycheck does

---

[3] Helen stated that she was still entitled to request her own advances, despite not personally entering into the Agreement with Celadon. Dkt. No. 88-3, Ex. B-2 at 38:12-25.

3

not cover the entire amount already advanced to that driver, the remaining amount is reflected as a reduction on the driver's subsequent paychecks until the entire advanced amount can be accounted for. Isaacs Dep., 50:21-51:2; Isaacs Decl., ¶ 11. If a driver's Agreement is terminated after that driver received advances that have not yet been accounted for on the driver's paychecks, the remaining advanced amount would be deducted from the driver's escrow account before the remaining escrow account funds are returned to the driver. Isaacs Dep., 51:12-52:25; Isaacs Decl., ¶ 12. Celadon has not sought to recover any advanced amounts not otherwise covered by a driver's paychecks or escrow account by taking legal action, hiring collection agencies, or debiting a driver's checking account in at least five years. Isaacs Dep., 51:12-52:6; Isaacs Decl., ¶ 13.

In their First Amended Complaint, Plaintiffs claimed that the advances made by Celadon constituted loans in violation of the Indiana Small Loans Act, Ind. Code §§ 24-4.5-7-101 *et seq.* ("ISLA"), and Indiana Consumer Loan Act, Ind. Code §§ 24-4.5-3-101 *et seq.* ("ICLA"). Dkt. No. 21, ¶¶ 97-130, 160-165. Plaintiffs further asserted that Celadon's deductions for items, such as "lease payments, fuel purchases, insurance purchases, and payroll advances," constituted wage assignments in violation the Indiana Wage Assignment Act, Ind. Code §§ 22-7-7-1 *et seq.* ("IWAA"), by including transaction fees in excess of the permissible 8% rate and by securing agreements for assignments exceeding thirty days. *Id.* at ¶¶ 131-139, 166-168.

On December 2, 2016, the Court dismissed Plaintiffs' claims pursuant to the ISLA, ICLA, and IWAA without prejudice and granted Plaintiffs leave to amend their First Amended Complaint. Dkt. No. 50. On December 15, 2016, Plaintiffs filed their Second

Amended Complaint, in which they re-plead their claims against Celadon under the ISLA, ICLA, and IWAA. Dkt. No. 52. Celadon filed the Motion on January 12, 2017, arguing that Plaintiffs' Second Amended Complaint still fails to sufficiently plead their claims under the ISLA, ICLA, and IWAA and that, in light of the undisputed material facts of this case, these claims should be dismissed as a matter of law. Dkt. No. 60; Dkt. No. 88.

## II. SUMMARY JUDGMENT STANDARD

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990). Motions for summary judgment are governed by Federal Rule of Civil Procedure 56, which provides in relevant part: "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials showing that a fact either is or cannot be genuinely disputed. Fed. R. Civ. P. 56(c)(1). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87

5

(1986); *Oliver v. Oshkosh Truck Corp.,* 96 F.3d 992, 997 (7th Cir. 1996). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying applicable evidence. *See Bombard v. Ft. Wayne Newspapers, Inc.,* 92 F.3d 560, 562 (7th Cir. 1996).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm,* 94 F.3d 254, 257 (7th Cir. 1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson,* 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.,* 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir. 1992). If the moving party does not have the ultimate burden of proof on a claim, it is sufficient for the moving party to direct the Court to the lack of evidence as to an element of that claim. *See Green v. Whiteco Indus., Inc.,* 17 F.3d 199, 201 & n. 3 (7th Cir. 1994). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir. 1996).

## III. COUNTS IV AND V—VIOLATIONS OF THE INDIANA SMALL LOANS ACT AND INDIANA CONSUMER LOAN ACT

In Counts IV and V of the Second Amended Complaint, Plaintiffs assert that the advances provided by Celadon constitute "loans" that violate the ISLA and ICLA, respectively. Dkt. No. 52 at 22-27, 31-32. However, Celadon argues in large part that the advances do not meet the definition of a "loan" under these statutes and, therefore, do not violate the ISLA or ICLA. Dkt. No. 88 at 8-9.

The ICLA defines a "loan" to include (1) a debt created "by the lender's payment of or agreement to pay money to the debtor" or to a third party on the debtor's behalf, (2) a debt created "by a credit to an account with the lender upon which the debtor is entitled to draw immediately," (3) a debt created "pursuant to a lender credit card or similar arrangement," and (4) "the forbearance of debt arising from a loan." Ind. Code § 24-4.5-3-106. As the Court previously stated, this statutory definition implies that a debt must be created in order for a loan to exist. Dkt. No. 50 at 6. The definition of a "loan" found in the ICLA is also applicable to the ISLA. Ind. Code § 24-4.5-7-102(1) ("Except as otherwise provided, all provisions of this article applying to consumer loans…apply to small loans, as defined in this chapter."). Under the ISLA, a "small loan" is defined as a loan (a) with a principal loan amount between $50 and $550; and (b) "in which the lender holds the borrower's check for a specific period, or receives the borrower's written authorization to debit the borrower's account … under an agreement, either express or implied, for a specific period" before the lender attempts to deposit or present the check or debits the borrower's account. Ind. Code § 24-4.5-7-104(1).

Although Plaintiffs claim that the advances paid by Celadon create debts that Plaintiffs must repay, the Court does not agree that the advances meet the statutory

definition "loans" under the ICLA and ISLA. Instead, the advances constitute early payments of wages either earned or to be earned by Plaintiffs for their services rendered to Celadon. The reductions reflected on Plaintiffs' paychecks for the advances merely act as an accounting measure for Celadon to ensure that it is not overpaying Plaintiffs for their services. *See Patton v. Stardust Transp., LLC*, 26 N.E.3d 1072 (Table), 2015 WL 160217, at *6 (Ind. Ct. App. Jan. 13, 2015) (finding that once a plaintiff was paid for labor performed, "his right to those wages divested," and that debits for those prior payments on the plaintiff's "subsequent paychecks were not deductions for wages owed—they were adjustments for wages that had already been paid.")

While Plaintiffs cite to *SDJ Ins. Agency, L.L.C. v. American Nat. Ins. Co.*, 292 F.3d 689, 694 (10th Cir. 2002), and *Ravetto v. Triton Thalasic Tech., Inc.*, 285 Conn. 716, 737-40 (2008), to argue that the advances constitute loans because Celadon can recover on its advances from sources beyond Plaintiffs' wages, Dkt. No. 73 at 9, these cases actually contradict Plaintiffs' argument. The courts in both *Ravetto* and *SDJ* provide that advances are generally presumed to be compensation, and that amounts advanced in excess of one's earned wages are not recoverable "unless an express or implied agreement to repay is established." *Ravetto*, 285 Conn. at 740. *See also SDJ*, 292 F.3d at 694. Under the terms of the Agreement, Plaintiffs "remain liable to [Celadon] for any remaining indebtedness" if the Agreement is terminated and if the amount of indebtedness exceeds both the Plaintiffs' wages earned and the amount remaining in their escrow accounts. Agreement § 10.05. Therefore, because an express agreement exists between Plaintiffs and Celadon that holds Plaintiffs personally liable to repay any advances exceeding their

8

earned wages, these cases do not preclude the Court from finding the amounts issued by Celadon to be advances rather than loans.

Plaintiffs also take issue with the Declaration of Felicia Isaacs ("Isaacs"), claiming that her declaration is inconsistent with her prior deposition testimony. *See* Dkt. No. 94 at 7-9. The Court disagrees. While Isaacs stated in her deposition that Plaintiffs owe Celadon and must repay Celadon for the advances given, Isaacs Dep., 50:1-53:15, such statements are consistent with the statements in her declaration that Plaintiffs received compensation before it was due. Isaacs Decl., ¶¶ 7-12. If Celadon already paid Plaintiffs for work they had not yet performed, Plaintiffs will still owe Celadon the performance of that work in order to rightfully earn the compensation they already received.

Because the Court concludes that the advances paid by Celadon to Plaintiffs constitute early payment of compensation, rather than loans that create debts that Plaintiffs must repay, the advances are not subject to either the ISLA or ICLA. Therefore, Counts IV and V of Plaintiffs' Second Amended Complaint must be dismissed.

## IV. **COUNT VI—VIOLATIONS OF THE INDIANA WAGE ASSIGNMENT ACT**

Count VI of Plaintiffs' Second Amended Complaint alleges that the advances paid by Celadon constituted wage assignments in violation of Sections 2 and 3 of the IWAA. Dkt. No. 52 at 27-29, 32. Specifically, Plaintiffs assert that Celadon violated (1) Section 2 of the IWAA by assigning Plaintiffs' wages more than thirty days before the assigned wages were earned and (2) violated Section 3 of the IWAA because, if Celadon is not Plaintiffs' employer, it acted as a wage broker that charged an excessively high interest rate to make wage assignments. Dkt. No 73 at 20-24; Dkt. No. 94 at 13-14.

An "assignment" of wages is defined as "[a]ny direction given by an employee to an employer to make a deduction from the wages to be earned by said employee, after said direction is given." Ind. Code § 22-2-6-1. Wage assignments may be made for many possible purposes, including payments for "equipment necessary to fulfill the duties of employment" and payroll advances. Ind. Code § 22-2-6-2(b). Therefore, the advances paid by Celadon to Plaintiffs can qualify as assignments of wages under Indiana law.

Section 3 of the IWAA ("Section 3") states that no wage broker may ask for, demand, or receive any compensation, interest, or other payment exceeding 8% per year for money he or she advances or loans to any employee or wage earner. Ind. Code § 22-2-7-3. A "wage broker" is defined as "[a]ny person, company, corporation, limited liability company, or association loaning money directly or indirectly to any employee or wage earner, except the employer of the employee, upon the security of or in consideration of any assignment of the wages or salary of such employee or wage earner." Ind. Code § 22-2-7-1(a).

Although Plaintiffs assert that Celadon acts as a wage broker in the alternative to being Plaintiffs' employer, Celadon cannot be a considered wage broker based on its advances to Plaintiffs, even if it is not Plaintiffs' employer. First, as stated above, the advances issued to Plaintiffs by Celadon constitute early payment of Plaintiffs' compensation and are not loans issued to Plaintiffs. *See supra*, Section III. Even if the advances were considered "loans" for the purposes of the wage broker definition, Celadon has not received any assignments of Plaintiffs' wages as security or consideration for providing the Plaintiffs the requested advances. While Plaintiffs argue that Celadon's advances were loans that were secured by Plaintiffs' future wages, Dkt.

No. 73 at 23, Celadon's accounting for prior advances on Plaintiffs' future paychecks merely ensure that Celadon does not overpay Plaintiffs for their services and do not constitute new assignments of Plaintiffs' wages. Furthermore, if Plaintiffs are not deemed employees of Celadon, there is no employer available that could make an assignment of wages that could serve as consideration or security for a loan made by Celadon as a wage broker. In other words, if Celadon is considered a wage broker, a distinct, third-party employer must participate in the transaction, in accordance with Ind. Code §§ 22-2-6-1 and 22-2-7-1(a). Therefore, even if Celadon is considered or is actually Plaintiffs' employer, the advances paid to Plaintiffs do not violate Section 3.

Under Section 2 of the IWAA ("Section 2"),

> [n]o assignment of his or her wages or salary by any employee or wage earner to any wage broker or any other person for his benefit shall be valid or enforceable, nor shall any employer or debtor recognize or honor such assignment for any purpose whatever, unless it be for a fixed and definite part of the wages or salary earned during a period not exceeding thirty (30) days immediately following the date of the assignment.

Ind. Code § 22-2-7-2. Based on this statutory language, an assignment of wages is invalid if, after thirty days have elapsed from the assignment, the wages assigned have not yet been earned by the wage earner.

In order be entitled to compensation for the delivery of a particular load, a Contracting Driver "must first submit to Celadon certain paperwork related to those loads." Isaacs Decl. ¶ 4. Once the necessary delivery paperwork is filed, Celadon is required to pay the Contracting Driver for his services in connection with that delivery within fifteen days. Agreement § 5.03. While, as stated above, the advances paid by Celadon to Plaintiffs constitute early payments of Plaintiffs' compensation, it is not clear from the evidence presented how much time passed between the date each advance was paid to

11

each of the Plaintiffs and the date by which the advanced amounts were earned by the Plaintiffs. Without such evidence, a question of fact exists as to whether the wages assigned through each advance were earned by the Plaintiffs within thirty days of each payment such that they constitute valid wage assignments under Section 2.

In light of the Court's careful consideration of Plaintiffs' IWAA claims and the Second Amended Complaint, the Court raises, *sua sponte*, the following questions: (1) whether any private right of action exists under the IWAA Section 2; (2) if so, whether Plaintiffs suffered any harm from Celadon's possible violations of Section 2; and (3) whether any private right of action exists under the Indiana Wage Deduction Act, Ind. Code § 22-2-6-1 *et seq.* ("IWDA"); and (4) if so, whether Plaintiffs suffered any harm from Celadon's possible violations of the IWDA. The Court expects the parties to address these questions according to the following briefing schedule:

1. Plaintiffs shall file a brief, of no more than fifteen pages, in support of a civil right of action for their claims under IWAA Section 2 and the IWDA, as well as the proper measure of damages thereunder, on or before June 23, 2017;

2. Celadon shall filed their response, also of nor more than fifteen pages, on or before July 14, 2017; and

3. Plaintiffs shall file their reply, of no more than 8 pages, on or before July 21, 2017.

## V. CONCLUSION

For the reasons stated herein, the Court **GRANTS in part and DENIES in part** the Motion. Dkt. No. 59. Furthermore, Helen Blakely's claim under Count III of the Second Amended Complaint, asserting violations of the Truth in Leasing Act, is **DISMISSED** *sua sponte*. The parties will brief the remaining questions under Section 2 of the IWAA and Indiana Wage Deduction Act as set forth in this Order. No partial judgment will issue at this time.

IT IS SO ORDERED this 2nd day of June, 2017.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Adam C. Smedstad
SCOPELITIS GARVIN LIGHT HANSEN & FEARY P.C.
asmedstad@scopelitis.com

Christopher C. Heery
SCOPELITIS GARVIN LIGHT HANSON & FEARY P.C.
cheery@scopelitis.com

Adam Eakman
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
aeakman@scopelitis.com

Braden Kenneth Core
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
bcore@scopelitis.com

Christopher J. Eckhart
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
ceckhart@scopelitis.com

Gregory M. Feary
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
gfeary@scopelitis.com

Justin L Swidler
SWARTZ SWIDLER
jswidler@swartz-legal.com

Matthew D. Miller
SWARTZ SWIDLER
mmiller@swartz-legal.com

Richard S. Swartz
SWARTZ SWIDLER LLC
rswartz@swartz-legal.com

Joshua Samuel Boyette
SWARTZ SWIDLER, LLC
jboyette@swartz-legal.com